# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL ACTION NO. 5:21-CV-00174-KDB-DSC

| | |
|---|---|
| **AMY RHINEHART CRAVEN,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **CHRISTOPHER NOVELLI, ALEXANDER ARNDT AND THE TOWN OF MOORESVILLE,** <br><br> **Defendants.** | <u>**ORDER**</u> |

Amy Craven, Chris Craven's widow, filed this action against two Mooresville, North Carolina police officers and the Town of Mooresville ("Town") claiming that police misconduct led to his death. On August 2, 2020, Alexander Arndt and Christopher Novelli ("Officers") responded to a "911" emergency call saying that Mr. Craven had assaulted his wife and threatened to "blow his brains out." On the way to the Craven residence, they were told by the dispatcher that he was armed with a gun and yelling. When the Officers arrived, Mr. Craven was shot and killed by the Officers after he (at a minimum) reached towards his handgun after being instructed by the Officers to keep his hands raised. Now before the Court are Defendants' Motion for Summary Judgment (Doc. No. 19), Plaintiff's Motion in Limine and Motion to Strike (Doc. No. 28) and the Parties' respective Motions to Seal (Doc. Nos. 17, 23).

Most simply put, Chris Craven died tragically, but not unlawfully. The Court has carefully reviewed all the evidence in detail, including the Officers' body camera videos and the 911 call. In light of the limited information that the Officers knew as they approached the residence and Mr.

1

Craven's actions in the few seconds after the Officers saw him in front of his house, no jury could reasonably find that the Officers used unconstitutionally excessive force in responding to Mr. Craven's immediate threat to their safety. Therefore, the Court will grant summary judgment for the Defendants. The Court will also deny Plaintiff's Motion in Limine and Motion to Strike because the 911 call evidence that Plaintiff seeks to exclude is relevant to Plaintiff's claims. Finally, the Court will grant in part and deny in part the Parties' Motions to Seal, unsealing only that portion of the submitted evidence that the Court relies on in ruling on the Motion for Summary Judgment and sealing the remainder to honor Plaintiff's appropriate request for privacy.

## I.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co.*, *et al.*, 946 F.3d 201, 206 (4th Cir. 2019).  A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law."  *Id.*, (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential

element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252, quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the

end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II. FACTS AND PROCEDURAL HISTORY

During the summer of 2020, Chris and Amy Craven lived in Mooresville, North Carolina with Taylor Dunn, Ms. Craven's twenty-one year old daughter from a previous marriage (who had lived with the Cravens since they married in 2007), and the Cravens' biological son and daughter, who were thirteen and seven. It was a stressful time for the Craven family (as it was for many in the first six months of the COVID-19 pandemic). Chris had worked for Hendricks Motor Sports as a parts coordinator throughout the marriage, while Amy had been employed as the Director of Nursing at The Pines at Davidson since 2015. The pandemic forced Chris to work from home, while Amy continued to go into work for her nursing job. Consequently, Chris assumed more at-home parent duties and responsibilities.

Amy Craven and Dunn testified that because of the COVID-19 pandemic Chris struggled with depression and his pre-existing anxiety was exacerbated. (*See* Doc. No. 20-7 at 38-39; Doc. No. 20-6 at 28). On August 2, 2020, Amy went into work and Chris remained at home. That evening, Chris "went into [a] mental health crisis," (Doc. No. 20-7 at 57) during which he became increasingly anxious and frustrated and began expressing feelings that he did not want to live. (Doc. No. 20-6 at 14, 33-34). Ms. Craven and Dunn decided to call "911," and Dunn called at approximately 9:30 pm. (*Id*. at 33, 35).

Dunn's 911 call is chaotic and chilling, punctuated with loud screaming, children pleading with their father not to kill himself and ultimately the sound of gunshots after Mr. Craven goes

4

outside to meet the police. *See* Doc. No. 20-11.[1] The first thing Dunn said to the 911 operator was, "My stepdad hit my mom in front of me and my siblings and he is threatening to blow his brains out and he is screaming and getting in her face and he won't stop." (*Id*. at 1; Doc. No. 20-6 at 53). Ms. Craven testified that Chris first left their bedroom then returned,  shut the door with her still inside, and held a gun to his head, threatening to kill himself. (Doc. No. 20-7 at 61).  At the same time, on the 911 call, Dunn was screaming at the operator that Mr. Craven had locked her mom in their room. (Doc. No. 20-11 at  2). Then, Mr. Craven came out of the bedroom and said, "Taylor called 911 so I'm going out there to do it right now, thank you." (*Id*.) This prompted more "kids crying and screaming in the background," as the children pleaded with their father not to end his life. (*Id*.). Also, at that point, Dunn responds "yes" to the operator's question, "Do you see a gun on him?" (although she then says that she just assumes he has a gun). The existence of the gun is later confirmed by both Ms. Craven and the Cravens' son. (*Id*. at 4; Doc. No. 20-7 at 69.).

At the time, Dunn also reported Mr. Craven had left the residence but she was unable to see what he was doing. (Doc. No. 20-11 at 4). Then, he came back into the house and asked for his phone, (Doc. No. 20-6 at 39; Doc. No. 20-11 at 5), saying that he wanted his phone so he could call his mother to tell her goodbye. (*Id*.). Seconds later, Mr. Craven can be heard saying, "When the police show up here, thank Taylor because (inaudible)" … "You won't have a (expletive) daddy no more (inaudible). (Doc. No. 20-11 at 5). Shortly after Mr. Craven makes those comments, he went outside and shots can be heard in the background, followed immediately by Dunn reporting to the operator amid screaming that she hears gunshots. (Doc. No. 20-11 at 6).

---

[1] There is no dispute that the transcript and recording of the 911 call which have been filed as exhibits are accurate. (*See* Doc. No. 20-6 at 43, 51, 56-57).

5

When Mooresville Police Department ("MPD") officers Arndt and Novelli received a dispatch call at approximately 9:30 p.m. that evening, they knew none of the Craven family's history and few of the details of Dunn's frantic 911 call (which they did not hear). What little they knew came from the dispatcher. In the initial call, Novelli, who was sitting in a grocery store parking lot in his patrol car, and Arndt, who was at the MPD, were told that a man had assaulted his wife and was threatening to "blow his brains out." (*See* Doc. Nos. 20-2, 20-3). Both officers immediately began driving (with their sirens and flashing lights on) to the Craven residence.

It took Arndt and Novelli a little over three and a half minutes to arrive. While they drove, they learned a bit more: (1:00)[2] "Male subject outside near a trailer or shed," (2:06) "Units heading towards Heritage, there hasn't been a shot discharged yet," (2:11) "Male subject is still outside at this time," (2:15) Someone asks, "Does anybody have a gun?" (2:34) "Caller assuming he has a gun – still trying to determine," and (3:11) "Mother and Son both confirming that he does have a gun on him."

Arndt and Novelli and the other MPD officers who were dispatched met down the street from the Cravens' house to ready themselves and approach on foot. While they were gathering, they were told (3:38) "Subject is outside – he may or may not be in the out-building or trailer. They don't have eyes on him, but he is outside" then (5:01) "Caller says that he may be coming back into the house" and finally (5:25) "He is back in the house. I can hear him yelling in the background." Knowing that Mr. Craven's wife (who had already been hit) and children were inside, the Officers immediately (5:34) started walking to the house.

---

[2] All times refer to officer Arndt's body camera video, a portion of which will be unsealed as discussed below.

Less than a minute later (6:21) the Officers, with Arndt in the lead, identified the house. As the Officers walk towards the driveway (where there is a trailer parked), but before Mr. Craven is seen, something appears to have been said from the direction of the house. (6:26-27). Neither Arndt nor Novelli (who was a number of feet behind Arndt) is clear about what was said.[3] Arndt says that he heard something like "just shoot me," "you are going to have to shoot me" or "(expletive) shoot me." (Doc. No. 20-3 at ¶8). Novelli, who shortly after the shooting said that he did not remember what was said, testified he thought he heard something like "what are you going to do" or "you're going to have to (expletive) kill me." (Doc. No. 20-2 at ¶ 9).

A second later (6:28-29), Mr. Craven comes into view and Arndt says "Police department. Let me see your (expletive) hands." At that point (6:30), Mr. Craven can be seen moving on the walk just in front of the low stairs that lead up to the porch. He is shirtless and a black holster can be seen near his right waistband. Hearing Arndt's command, which he repeated ("Let me see your hands"), Mr. Craven raises his hands (6:31), but then brings his hands down towards his waist, his right hand lowering more quickly than his left hand (6:32). After Mr. Craven's hands are coming down, Arndt yells for Mr. Craven to "get on the (expletive) ground." (6:32-33). Both Arndt and Novelli testified that after lowering his hands, Mr. Craven pulled out a handgun with his right hand, and they began firing their rifles until Mr. Craven fell to the ground. (6:34 – 6:39) (Doc. Nos. 20-2 at ¶¶10-14; 20-3 at ¶¶10-11). All parties agree that the lighting of the body camera video makes it impossible to see Mr. Craven's hands after they are seen moving down.

_____

[3] As discussed further below, counsel for all parties admit that what is said cannot be fully heard and understood from the body camera video, other than perhaps the word "shoot."

After a short pause, the Officers moved in towards Mr. Craven. (6:49) (*Id.*) A few seconds later, Arndt asks, "Where did the handgun go?" and a light is flashed on it lying against a step (on which the body camera video shows there was no gun prior to the shooting). (6:56). Novelli and other MPD officers then went into the house to check on the family, and Arndt and others provided medical attention to Mr. Craven until paramedic personnel arrived. Mr. Craven died at the scene from the Officers' multiple gun shots. Other than the gunshots, no one inside the house (or any neighbors) heard or saw MPD's interaction with Mr. Craven. (*See* Doc. No. 20-7 at 62-63; Doc. No. 20-6 at 42-43, 61).

Amy Craven was appointed Administratrix of Mr. Craven's estate. She commenced this action by filing a Complaint in the Superior Court of Iredell County, North Carolina on September 7, 2021. The Defendants removed the action to this Court on December 3, 2021. (Doc. No. 1). In her Complaint, she asserts both federal and state law claims, including violation of 42 U.S.C. § 1983, wrongful death, assault and battery, negligence/gross negligence, and punitive damages. On January 20, 2023, Defendants filed a Motion for Summary Judgment seeking to dismiss all of Plaintiff's claims. (Doc. No. 19). In addition to her response to that motion, Plaintiff filed a Motion in Limine and Motion to Strike, seeking to exclude all evidence related to the 911 call, on the grounds that the officers did not hear the call and it is "unduly prejudicial." (Doc. No. 28). Both parties filed consent motions to seal the Officers' body camera videos, the 911 call recordings and the autopsy report. (Doc. Nos. 17, 23).

8

## III. DISCUSSION

### A. Motion for Summary Judgment

While Plaintiff asserts numerous claims as listed above, the core of the legal dispute before the Court is whether a jury could reasonably find in favor of Plaintiff on her claim that the Officers used unconstitutionally "excessive" force against Mr. Craven, considering all the circumstances. If so, then some of Plaintiff's claims might survive summary judgment. If not, then Defendants are entitled to summary judgment on each of Plaintiff's claims. Thus, the Court will focus its attention on Plaintiff's lone federal claim under Section 1983 then address more briefly Plaintiff's state law claims, all of which also depend on a finding that the officers acted wrongfully in shooting Mr. Craven.

First, it is important to note that standard summary judgment rules apply to claims of excessive force against police officers. *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). That is, "the Court must determine whether any material facts are genuinely disputed, i.e., is the evidence offered such that a reasonable jury might return a verdict for the non-movant." *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021); *Pritchard v. Mobley*, No. 4:20-CV-00060-M, 2022 WL 983159, at *4 (E.D.N.C. Mar. 30, 2022). However, because the alleged victim in excessive force cases may be unable to testify, the Fourth Circuit has cautioned the District Courts not to "overvalue the narrative testimony of an officer and to undervalue potentially contradictory" evidence. *Stanton*, 25 F.4th at 234. Still, our Court of Appeals is clear that this admonition ought not lead the Court to be "especially critical of officer testimony in these cases." *Id.* Rather, the Court "need only apply ... normal summary-judgment rules, which ask

9

whether reasonable juries might disagree over some material factual dispute." *Id.*; *see Heavner v. Burns*, No. 521CV00159KDBDCK, 2022 WL 17477561, at *3–4 (W.D.N.C. Dec. 6, 2022).

### 1. Section 1983

#### a) Alleged Excessive Force in Violation of the Fourth Amendment

Plaintiff's only claim under federal law is her First Cause of Action, which alleges that the Town and the Officers, who are sued in both their individual and official capacities, violated 42 U.S.C. § 1983. While not a source of substantive rights, Section 1983 provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, a case filed under 42 USC § 1983 provides potential remedial relief for a plaintiff who can prove that a person acting under color of state law deprived him of a right secured by federal law, including violations of federal constitutional rights, as well as certain limited federal statutory rights. *See Maine v. Thiboutot*, 448 U.S. 1 (1980); *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir.) (2022); *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017). Here, Plaintiff alleges that the Officers "used excessive force … in violation of the Fourth Amendment's right to be free from unreasonable seizures." Doc. 1-1 at ¶38.

10

"The use of deadly force is a seizure subject to ... the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Knibbs*, 30 F.4th at 214; *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). The Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013); *Stanton*, 25 F.4th at 233. "Whether an officer has used excessive force is judged by a standard of objective reasonableness." *Id*., quoting, *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). Moreover, "recognizing that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the 20/20 vision of hindsight." *Id*.; *Stanton*, 25 F.4th at 233. ("In questioning the split-second decisions of police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment.").

Thus, to determine whether such probable cause exists, the Court must ask whether the Officers' use of deadly force was 'objectively reasonable in light of the facts and circumstances confronting them, viewed in the light most favorable to the Plaintiff, without regard to the Officers' underlying intent or motivation. *Knibbs*, 30 F.4th at 214; *Hensley*, 876 F.3d at 582. The Court must focus on "the totality of the circumstances" based on the "information available to the Officers 'immediately prior to and at the very moment [they] fired the fatal shots.'" *Id*. In this case, the key factor, among those typically considered,[4] is "whether the suspect posed an immediate threat to the safety of the officers or others." *See Graham v. Connor* 490 U.S. 386, 396 (1989).

---

[4] The other *Graham* factors are "the severity of the crime" and "whether [the suspect] is actively resisting arrest or attempting to evade arrest." *Graham v. Connor* 490 U.S. at 396. While the danger

The record in this case cannot support a finding that the Officers' conduct was not objectively reasonable, viewing the evidence in the light most favorable to the Plaintiff. At the time the Officers fired their weapons, they undisputedly knew or believed the following: 1) they were confronting a person who had assaulted his wife; 2) Mr. Craven was, at a minimum, unstable and agitated because he had threatened "to blow his brains out" and had been yelling very shortly before; 3) Mr. Craven was armed with a handgun; and 4) after being told to raise his hands, he lowered his hands towards the holster in his waistband. Under such circumstances, it was objectively reasonable for the Officers to conclude – in the literal split second they had to make a decision whether to use deadly force – that Mr. Craven posed an immediate threat to their safety. *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991); *Knibbs*, 30 F.4th at 215 (distinguishing but affirming the continued precedential value of *Anderson* and *Slattery*).

In *Slattery* and *Anderson*, two cases involving an officer's reasonable – but ultimately incorrect[5] – belief that an individual possessed a firearm and was about to use it, the court found that a suspect's movements toward a perceived firearm while disobeying the officer's command not to do so "would rightfully cause a reasonable officer to fear that the suspect intended to cause imminent deadly harm." *Knibbs*, 30 F.4th at 215; *see Slattery*, 939 F.2d at 215–16 (holding an officer reasonably feared for his life after he twice ordered the suspect to put his hands up, but the

_____

to Ms. Craven and the children was indeed serious, at the time of the use of force they were in the house. Also, the incident happened so quickly that the Officers had not yet begun to arrest Mr. Craven. Therefore, as in *Knibbs*, "the first and third *Graham* factors offer only limited probative guidance." *Knibbs*, 30 F.4th at 216.

[5] Unlike in *Slattery* and *Anderson*, Mr. Craven did in fact have a gun, consistent with what the Officers were told before arriving at the house and what they say they saw prior to the shooting.

suspect ignored those commands, instead reaching down to an area out of the officer's sight and grabbing an object that turned out to be a beer bottle); *Anderson*, 247 F.3d at 128, 131 (holding that an officer reasonably feared for his life during an investigation of a man thought to be armed after the officer ordered the man to get down on his knees and put his hands up, but the man began reaching in his back left pocket for what turned out to be a Walkman radio).

More recently explaining these holdings, the Fourth Circuit said:

> In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's *continued movement* will likely raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact, as in *Anderson* and *Slattery*, the officer can reasonably expect the worst at the split-second when he acts.

*Knibbs*, 30 F.4th at 220-221, quoting *Hensley*, 876 F.3d at 585 (emphasis added in *Knibbs*). Moreover, "[the Fourth Circuit] has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Id.*, quoting *Anderson*, 247 F.3d at 131 (collecting cases). *See also Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787–88 (4th Cir. 1998) (holding that officers acted reasonably in fearing for their lives before shooting an individual who the officers knew had made threats to his own life and to the officers' lives after the individual exited his home while appearing to hold a knife, walked towards the officers, and disobeyed an officer's commands to stop).

Plaintiff urges the Court not to rely on *Slattery* and *Anderson*, but instead follow *Knibbs*, *Cooper*, and *Hensley*, cases in which the court held that police officers' use of deadly force were not objectively reasonable. The Court must decline that invitation, as those cases are

13

distinguishable on their facts.[6] In *Knibbs*, the Court emphasized that, unlike in this case, there were disputed issues of fact whether the decedent, who was inside his house with a gun, knew that law enforcement was on his darkened porch or whether Knibbs ever raised the gun to the officer. Under those different facts, the court held that if a jury found that the defendant shot Knibbs "simply because he had possession of a firearm within the confines of his own home" that would violate the Fourth Amendment. *Knibbs*, 30 F. 4th at 221-222. Here, there is no question that Mr. Craven knew that the police were coming to his home, went outside to meet them with his handgun and then failed to keep his hands raised when ordered to do so. Thus, the court's concern over a law enforcement officer shooting a homeowner who may be legitimately trying to protect his family and property from an unknown person on his porch is inapplicable.[7]

Similarly, in *Cooper,* the Court found that a reasonable officer would not have probable cause to feel threatened where the suspect "stood in the threshold of his home, holding his shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands." *Cooper*, 735 F.3d at 159. The Court also pointed out that it was important the officers never identified themselves and that if the officers had identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id.* Again, here the Officers identified themselves as

---

[6] Notably, neither the parties nor the Court of Appeals in deciding the various cases debate the governing legal standards, but rather the application of the facts to those principles.

[7] "[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force. Thus, an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Cooper*, 735 F.3d at 159. Instead, deadly force may only be used by a police officer when, for example, he has a reasonable concern for his immediate safety as discussed above.

14

police officers, and Mr. Craven clearly heard them as he initially complied with their commands by raising his hands. (Doc. No. 20-2 at ¶ 12; (06:31)). Further, Mr. Craven then ignored their command by lowering his hands.

Finally, in *Hensley*, the suspect had a gun when the police arrived on scene and then walked off his porch with the weapon pointed down. *Hensley*, 876 F.3d at 584. The Court found there was no reason for the police to suspect an immediate threat because none was offered and "no command to stop, drop the gun, or raise his hands" was issued. *Id*. at 585. So, *Hensley* is distinguishable for the same reasons as *Cooper*.[8]

In support of her efforts to come within the ambit of *Knibbs*, *Cooper*, etc., Plaintiff makes several factual contentions on which she argues that the jury could find in her favor. Still, to survive summary judgment Plaintiff must proffer evidence from which a jury could *reasonably* find for Plaintiff, *i.e.*, based on facts not, for example, speculation or sympathy. The Court finds that Plaintiff's arguments fall short of that mark. First, Plaintiff argues that the jury may not find the Officers to be credible based on alleged inconsistencies between the Officers' testimony and the

---

[8] Plaintiff also cites *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) as authority for her contentions. In *Cruz*, the Court allowed claims of excessive police force to proceed to trial, holding that a jury need not accept the testimony of law enforcement officers that a motorist at a traffic stop pulled a gun where there was circumstantial evidence that could give a reasonable jury pause, such as the fact that Plaintiff did not have a gun on him so why would he be reaching for a gun. *Id.* Beyond the non-binding nature of this authority, even if a jury here did not accept the Officers' testimony that they saw a gun, all the circumstantial evidence supports the existence of a gun, including that a gun was found next to Mr. Craven's body, he had on a holster and his wife testified he had a gun on him when she saw him in the home. (Doc. No. 20-7 at 69; Doc. No. 20-2 at ¶ 14; Doc. No. 20-3 at ¶ 11; (6:56)).

15

body camera videos. However, any variance between the Officers' recollections and the video must relate to a material disputed fact.

Plaintiff contends that there is a genuine issue of material fact as to whether Mr. Craven ever "brandished a gun" towards the Officers or reached for his waistband. Neither argument is persuasive. As to whether Mr. Craven actually pulled out his gun, even assuming that is a disputed issue because the video does not corroborate[9] the Officers' testimony,[10] the Officers' potential liability for excessive force does not turn on whether Mr. Craven grabbed his gun, thus it is not a material disputed fact. As discussed above, a police officer is not required to "wait until a gun is pointed at him before he is entitled to use deadly force." *See Knibbs*, 30 F.4th at 220-221.

With respect to whether Craven actually reached for his waistband, the video makes clear that he did, notwithstanding Plaintiff's suggestion otherwise. *See* Doc. 25 at 15. Plaintiff is of course entitled to argue her own version of what happened, but she must create that "version" from actual facts, not speculation, assertions or inferences at odds with undisputed video or physical evidence. Here, the video footage clearly shows Mr. Craven's hands coming down towards his waist, his right hand more quickly than his left hand. When a video "quite clearly contradicts the version of the story told by [Plaintiff] … so that no reasonable jury could believe it, a court should

---

[9] Plaintiff repeatedly and incorrectly argues that the video "contradicts" the Officers' testimony, when it cannot be determined what happened from the video on a particular point, such as whether or not Mr. Craven pulled out his handgun. Uncertainty is not contradiction. Rather, it is simply the absence of corroboration. That is, if the video does not show one way or the other if Mr. Craven "brandished" his gun then it is unavailable to support either Plaintiff's or the Officers' position. But, similarly, it does not "contradict" either position.

[10] However, other evidence is consistent with the Officers' testimony, including Mr. Craven's statement on the 911 call that he would be dead after the police arrived (i.e., he intended to pull his gun and expected the police would shoot and kill him) and the undisputed fact that after Mr. Craven was shot, his gun was a short distance behind him on the steps, which is unlikely unless the gun was already out of the holster when the shooting began.

not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007).

Plaintiff also questions whether Mr. Craven had a gun and whether Mr. Craven's hands were already coming down before he was ordered to get on the ground. Again, the video and physical evidence is clear on these points and no reasonable jury could find in Plaintiff's favor on these issues, even viewing the evidence in the light most favorable to the Plaintiff.[11] Whether Mr. Craven had a gun with him when he encountered the Officers is not reasonably in dispute. Seconds after he was shot, his gun can be seen on the steps directly behind his body. (6:49, 6:56). And it can be seen on the video that no gun was on the steps when Mr. Craven walked to the side of the steps. (6:31, 6:33). Thus, the existence of the gun is fully corroborated by the physical evidence. Also, it is supported by both the testimony of Ms. Craven and the 911 call. *See* Doc. No. 20-7 at 69; Doc. No. 20-11 at 5. Similarly, the video clearly shows that Mr. Craven begins to bring his hands down before[12] Arndt tells him to get on the ground. (6:32-33).

---

[11] In the same vein, Plaintiff argues that the jury could find that the audio of the verbal statement being made as the Officers approached the house, (6:26-27), can reasonably be interpreted as Mr. Craven saying: "Ya'll know you *don't* have to shoot me" rather than the Officers' recollection that he said something to the effect of "you are going to have to shoot me." But, when questioned at oral argument as to what actual evidence supported that contention, Plaintiff's counsel correctly acknowledged that the audio was entirely unclear on that point and Plaintiff's suggested words could not be made out from listening to the audio. Again, the jury must make its decisions based on evidence, not speculation. So, in the absence of audio or other evidence from which the jury might conclude Plaintiff's alternate version of the statement was made, the Court cannot properly credit that possibility.

[12] At oral argument, Plaintiff's counsel argued that the two events were "close" in time or "simultaneous." Certainly, Mr. Craven's bringing his hands down was close in time to the command to get on the ground, as the entire incident took only a few seconds. However, the two events did not happen simultaneously. The video shows that Mr. Craven brought his hands down towards his waist just prior to being told to get on the ground.

17

Further, Plaintiff argues that the Officers' use of deadly force may be found to be excessive because Mr. Craven did not make any "furtive" movement towards his gun, relying on the dictionary definition of "furtive" as "done in a quiet and secretive way to avoid being noticed." *See* Doc. No. 25 at 15. However, the governing cases discussed above do not limit a suspect's movements that may allow an officer to use deadly force to "furtive" ones (although those are plainly encompassed by the cases). Nor, would it make sense to do so. Surely, even though a "secretive" movement can sufficiently prompt police action that doesn't mean more overt movements (like reaching for a gun on a nearby table) cannot. Again, the cases are clear that police don't have to wait for a suspect to draw and point the weapon, as in effect suggested by Plaintiff. Considering *Hensley*, *Cooper*, *Anderson* and *Slattery* together, the key distinction is whether, considering the totality of the circumstances (including due regard for the exigency of the situation), the suspect's movements are threatening or potentially dangerous (such as reaching for a potential weapon after being told to show his hands in *Anderson* and *Slattery*) rather than innocent or innocuous (for example holding a gun safely and walking or standing as in *Hensley* and *Cooper*). Here, Mr. Craven reached down towards his waistband after an order was given to show his hands, which would cause a reasonable officer to fear for his safety, regardless of whether or not the movement was considered "furtive."

Finally, Plaintiff faults the Officers for not attempting to "deescalate" the situation. Quite understandably, she wishfully envisions an alternative scenario in which the officers approached the volatile situation "calmly" and somehow reasoned with Mr. Craven not to hurt himself or others so that he remained alive. Even if that had been possible – and the 911 call in which Mr. Craven says that he will be dead once the police arrive obviously suggests the difficulty of achieving a

18

peaceful solution – it is not the Court's role to determine if that sad night could have ended differently. Neither "best practices" nor perfect outcomes are constitutionally mandated. Yes, the Officers' response to the 911 call could have turned out better,[13] but it also could have turned out far worse, with an armed man retreating back into the house and harming not only himself, but also his wife and children. It is a considerable understatement to say it is regrettable when police efforts intended to protect the community (here, specifically, Ms. Craven and her children) lead to tragic consequences. However, the Court must address the circumstances as they occurred and make a judgment only on the limited legal questions presented.

In sum, as discussed in detail above, Plaintiff has put forward neither testimonial nor physical evidence that materially contradicts the Officers' version of events. Thus, the Court can find no evidence from which a jury could reasonably find in favor of Plaintiff's claim that the Officers used unconstitutionally excessive force against Mr. Craven.

### b) Qualified Immunity

In addition to asserting the lawfulness of their conduct, the Officers contend they are entitled to qualified immunity from the Plaintiff's claims. When, as here, a law enforcement officer is sued in his individual capacity, he is "entitled to invoke qualified immunity, which is ... immunity from suit itself." *Cooper*, 735 F.3d at 158. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Knibbs,* 30 F.4th at 214 (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)). In determining whether an officer is entitled to qualified immunity,

---

[13] The Court does not intend by this discussion to either commend or criticize the Officers' conduct. Plainly, the goal of any police encounter should be to protect all citizens involved, including the police, with minimal harm to the suspect, particularly one who is threatening suicide.

19

courts look to: (1) "whether a constitutional violation occurred"; and then (2) "whether the right violated was clearly established." *Id.*; *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry*, 652 F.3d at 531. The doctrine balances two important values—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

The Fourth Circuit has stated:

> The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted) (emphasis added); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted).

In carrying out the qualified immunity analysis, a court's "first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). The court then engages in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348,

20

353 (4th Cir. 2010). Courts have discretion to take these steps in either order. *Pearson*, 555 U.S. at 236.

As discussed above, the Court finds that a constitutional violation did not occur so it need only further address the second question. A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 195 (2001). As the Fourth Circuit has explained:

> It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the constitutional premise in question. Put differently, a right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question.

*E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018); *A.G. v. Fattaleh*, No. 520CV00165KDBDCK, 2022 WL 2758607, at *8–9 (W.D.N.C. July 14, 2022).

Under *Graham*, the law is clear that, as a general matter, a police officer must carefully measure the force used to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and any attempt to evade arrest or flee. *See Graham*, 490 U.S. at 396. But, the Supreme Court has emphasized that Graham is "cast at a high level of generality," *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)), and does not by itself "create clearly established law outside 'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 79-80 (2017); *E.W.*, 884 F.3d at 186. As described above, the Fourth Circuit has applied *Graham* in numerous cases, none of which would have given notice to

21

the Officers that their conduct in this case would violate "clearly established law." Indeed, as previously discussed, *Anderson* and *Slattery* suggest that the Officers' actions were lawful. Therefore, the application of *Graham* to these circumstances is, at a minimum, uncertain. So, the Officers are entitled to qualified immunity, even if it were found that they committed a constitutional violation (which the Court does not find for the reasons stated earlier).

### c) Official Capacity Claims Against the Officers

In addition to the Section 1983 claims asserted against the Officers as individuals, Plaintiff has asserted claims against the Officers in their "official capacity." An "official capacity" claim against an individual is "essentially the same as a claim against the entity;" therefore, courts often hold they "should be dismissed as duplicative when the entity is also named as a defendant." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *see also Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 463 2016) ("duplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed"). In this action, Plaintiff has sued the Town as well as the Officers. Accordingly, as candidly acknowledged by Plaintiff's counsel at oral argument, the "official capacity" claims against the Officers are duplicative. Further, because the Officers are not liable in their individual capacities on Plaintiff's Fourth Amendment claims, there can be no vicarious official Section 1983 liability as to any of Plaintiff's theories. *See, e.g., Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996). Thus, the Court will grant summary judgment on Plaintiff's claims against the Officers in their official capacity.

### d) *Monell* Claim Against the Town of Mooresville

The last issue with respect to Plaintiff's Section 1983 claims is her claim against the Town for the Town's alleged failure "to adequately train and instruct its officers on how to interact with and respond to citizens experiencing a mental health crisis." Doc. No. 25 at 18. A municipality is considered a "person" and thus subject to suit. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538 (4th Cir. 2018). However, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Under *Monell*, there are four theories that can be potentially pursued under Section 1983 to show an unlawful custom, policy, or practice: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [employees], that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Beyond identifying a policy or practice that may be attributable to the governmental unit, the plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original). In other words, a plaintiff must show that the action was taken with the requisite degree of culpability and must demonstrate a direct causal link

between the action and the deprivation of federal rights. *Id.* Indeed, "[t]he first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

The Supreme Court has thus made clear that a Plaintiff seeking to impose *Monell* liability bears a heavy burden: "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997) (citation omitted). The Fourth Circuit has similarly held that "[t]he substantive requirements for proof of municipal liability are stringent." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Plaintiff claims the Town violated Mr. Craven's constitutional rights under the third theory; that is, because of its "failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens.'" Plaintiff alleges that a training deficiency – the failure to instruct the Officers on how to interact and respond to citizens experiencing a mental health crisis – made the alleged constitutional violations a "reasonable probability rather than a mere possibility." *See Spell v. McDaniel*, 824 F. 2d 1380, 1390 (4th Cir. 1987); *Semple v. City of Moundsville*, 195 F. 2d 708, 713 (4th Cir. 1999).

At the outset, the Court notes what should be obvious – the Court's finding that the Officers did not violate Mr. Craven's constitutional rights also dooms Plaintiff's *Monell* claim against the Town. Because there must be a direct causal link between the failure to train and the alleged constitutional deprivation, if there is no constitutional violation then the causal connection cannot

24

be made. Further, as discussed below, the Court finds that even if Plaintiff had established a viable claim of a constitutional violation, the Town is not liable for a failure to train under *Monell*.[14] Therefore, Defendants are entitled to summary judgment on Plaintiff's Section 1983 claims against the Town.

In *City of Canton v. Harris*, 489 U.S. 378, 389 (1989), the Supreme Court indicated "that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations." *See Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997). Thus:

> [A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation--that the municipality's indifference led directly to the very consequence that was so predictable.

*Id.* at 409-410, 117 S.Ct. 1382. The Supreme Court gave an example in *City of Canton*: the certainty that police officers will be required to arrest fleeing felons, and that because officers have been provided firearms to accomplish that task, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.*, 489 U.S. at 390, n. 10 (internal citation omitted).

Still, in *City of Canton*, the Court required that "only where a failure to train reflects a deliberate or conscious choice by a municipality ... can a city be liable for such a failure

---

[14] The Court specifically limits this finding to the particular facts of this case and expresses no opinion as to whether the Town has sufficiently trained its police officers on handling citizens with mental health problems in other circumstances.

25

under § 1983." *Id.* at 390. The Court reasoned that "the focus must be on adequacy of the training program in relation to the tasks that the particular officers must perform" and further stated, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-91. The Court continued:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual recurring situations with which they must deal. And, plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Moreover, under *Monell* a single incident is almost never enough to warrant municipal liability. "Proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Semple v. City of Moundsville*, 195 F. 3d 708, 713-14 (4th Cir. 1999). "At its core, the strict *Monell* test asks for some level of notice." *Estate of Jones v. City of Martinsburg*, 961 F. 3d 661, 672 (4th Cir. 2020). "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents' ... nor is a showing that individual officers violated a person's constitutional rights on an isolated occasion ... sufficient to raise an issue of fact whether adequate training and procedures were provided." *Orpiano v. Johnson*, 632 F. 2d 1096, 1101 (4th Cir. 1980); citing *Withers v. Levine*, 615 F. 2d 158, 161 (4th Cir. 1980), and *McClelland v. Facteau*, 610 F. 2d 693, 697 (11th Cir. 1979).

Plaintiff contends that the Officers received little or no specific training on handling "citizens experiencing a mental health crisis." Defendants counter that the Officers received

26

training on handling persons with mental health issues during basic police training.[15] Also, more relevant according to the Town, the Town has a policy (which Plaintiff has not challenged) related to the use of force and the Officers received training related to that policy and the use of force more generally. Again, even though Mr. Craven's unstable mental health was part of the knowledge they carried into the incident because he had threatened to kill himself, the Officers were called to respond to a domestic assault by an armed man in a home in which children were present. Therefore, this incident was not simply the handling of "a mental health crisis" or a "suicide prevention" call. Instead, the Officer's response to the 911 call primarily implicated broader training that Plaintiff does not contend was lacking.

Also, the Town argues that there is no evidence that it was on "notice" that its training of police officers related to handling citizens with "mental health issues" was inadequate.[16] The Court agrees. Plaintiff has proffered no evidence on this issue other than generally criticizing the alleged paucity of training. Indeed, Plaintiff has failed to describe with any specificity what training the Town should have provided and how such training would have prevented the alleged constitutional violation in these specific circumstances. Therefore, the Court find that the Town's training does not rise to the level of "deliberate indifference," so Plaintiff's forecast of evidence fails to establish the necessary elements to extend liability to the Town under 42 U.S.C. § 1983.

---

[15] As with its conclusions above with respect to alleged constitutional violations, the Court's ruling is not meant to suggest that the Town should not further train its police officers in handling the extremely challenging tasks of responding to citizens with mental health problems, particularly those who are armed and may hurt others or themselves.

[16] Plaintiff cites *Estate of Chivrell v. City of Arcata*, 2022 U.S. Dist. LEXIS 153466, *9-10 (N.D. Ca. Aug. 25, 2022), which held plaintiff had stated a Monell claim of inadequate training based on a single incident of a fatal police shooting of a mentally-ill man with a holstered firearm. Putting aside the factual differences of that case, it is not binding on this Court.

27

### 2. State Law Claims

In addition to Plaintiff's Section 1983 claims, Plaintiff has asserted numerous claims under North Carolina state law, including assault and battery, wrongful death, negligence / gross negligence and punitive damages. As noted above, the merits of these claims primarily follow and depend on Plaintiff establishing – as was required under her federal claim – that the Officers acted wrongfully and violated Mr. Craven's rights, resulting in his death. Thus, the parties focused their arguments on Plaintiff's federal claim, which the Court has done as well in this Order. So, for the same reasons that the Court finds that the Defendants are entitled to summary judgment on Plaintiff's Federal law claim, they are also entitled to summary judgment on Plaintiff's state law claims. Nevertheless, each of Plaintiff's state law claims is addressed briefly below.

### a) Assault and Battery

The Fourth Circuit has recognized that, "the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence." *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998); *Knight Estate of Graham v. City of Fayetteville,* 234 F. Supp. 669, 692 (E.D.N.C. 2017). Therefore, state law tort claims that are premised on an officer's reasonable, non-excessive use of force are not actionable under North Carolina law. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625 (2000); *Todd v. Creech*, 23 N.C. App. 537, 209 S.E.2d 293 (1974); *Bell v. Dawson,* 144 F. Supp.2d 454, 464 (W.D.N.C. 2001); *Wilcoxson v. Painter*, 2016 WL 866327, *10 (E.D.N.C. March 3, 2016) ("[w]here a law enforcement officer's use of force was reasonable for the purposes of finding qualified immunity to a § 1983 excessive force claim, it is fatal to the Plaintiff's state law tort claims.").

28

Plaintiff acknowledges that her assault and battery claim rises and falls with her Fourth Amendment claim. The entirety of Plaintiff's argument on the assault and battery claim is as follows: "Finally, because Plaintiff has stated claims under Section 1983 for Officers Arndt's and Novelli's use of excessive force in violation of Craven's Fourth Amendment rights, she has also sufficiently alleged state law claims for assault and battery." Doc. No. 25 at 24. Therefore, because Plaintiff has failed to establish that the Officers used excessive force or otherwise violated Mr. Craven's constitutional rights, Defendants are entitled to summary judgment on Plaintiff's claim of assault and battery.

### b) Wrongful Death, Negligence and Gross Negligence

Plaintiff also asserts state law wrongful death claims and negligence/gross negligence claims against all Defendants. (Doc. No. 1 at ¶¶ 48-58, 69-72). In addition to their defenses on the merits, Defendants argue that the Officers are subject to public officials' immunity as to the individual capacity claims, and the Town is entitled to governmental immunity as to any official capacity claim.

Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412 (1976) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783 (1952)). This immunity has been recognized at common law for over a century. *See Epps*, 122 N.C. App. at 202, 468 S.E.2d 846. North Carolina courts have deemed police officers engaged in performance of their duties as public officials for the purposes of public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726 (2003).

29

However, public official immunity is not absolute. Public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox*, 222 N.C. App. at 288, 730 S.E.2d 226. An individual acts with malice when he "wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Evans v. Croft*, 265 N.C. App. 601, 827 S.E.2d 342 (2019). There is no allegation that the Officers acted outside the scope of their authority or corruptly; therefore, whether the Officers are entitled to public official immunity turns on whether they acted with malice.

The Court finds there is no evidence that indicates the Officers acted with malice in responding to the 911 call at the Craven residence. The incident, from the time the Officers received the dispatch call until Mr. Craven was shot took less than seven minutes. There is simply no indication that during that time (or earlier) the Officers acted with any malice towards Mr. Craven or his family. On the contrary, from all the evidence in the record, they attempted to carry out their difficult job appropriately and fired on Mr. Craven only because they believed he posed an immediate threat to their safety.

Plaintiff contends that evidence of the Officers' malice can be found in text messages sent seven to sixteen months after August 2020 in which they, after reading press articles and being sued, inappropriately made insensitive remarks, including about the significance of their actions ("all we did was kill somebody") and the number of gunshots. *See* Doc. No. 33-3 at 4, 10, 12. Beyond the long temporal distance between the texts and the alleged incident, the texts do not establish that the Officers acted with malice. Indeed, the Officers' texts in the days immediately following the shooting were much more circumspect, with the Officers' texts saying that "it sucks

30

that it happened" and it was "unfortunate," but couldn't be avoided. *See* Doc. 33-3 at 5, 17, 23. Therefore, while the Court does not in any way condone the Officers' inappropriate texts cited by Plaintiff, the texts do not provide sufficient evidence of malice to support a finding that the Officers are not entitled to public officer immunity.

Similarly, there has been no waiver of the Town's governmental immunity. Governmental officials are entitled to governmental immunity unless they waive it through the purchase of insurance; however, any waiver is limited to the extent of insurance coverage. *Satorre v. New Hanover Cnty. Bd. Of Comm'rs,* 165 N.C. App. 173, 176 (2004). All of the acts complained of occurred on August 2, 2020. During that time, the Town of Mooresville had in effect a general liability insurance policy that contains a non-waiver of governmental immunity provision. The provision specifically states, "This policy is not intended by the ASSURED to waive its governmental immunity as allowed by North Carolina General Statutes Section 115C-42, Section 153A-435, Section 160A-485, or any amendments thereof)." Similar language has been held to preserve governmental immunity. *See, e.g., Evans v. Chalmers,* 703 F.3d 636, 656 (4th Cir. 2012) (citing North Carolina authority). Therefore, the Town has retained its governmental immunity from liability on Plaintiff's wrongful death and negligence / gross negligence claims.

### c) Punitive damages

Finally, Plaintiff's "claim" for punitive damages cannot survive summary judgment. Although pled as a separate cause of action, Plaintiff's allegations make clear that her claim for punitive damages is only a request for additional relief on Plaintiff's claims under Section 1983 and North Carolina law. Having already determined that Defendants are entitled to summary judgment on Plaintiff's "underlying" claims, Defendants are also entitled

31

to summary judgment on any claim for punitive damages related to those claims. More specifically, as discussed above, there is no evidence in the record from which a jury could conclude that the Officers acted with "malice" or otherwise engaged in willful, wanton, or grossly negligent conduct. Therefore, Plaintiff's claim for punitive damages fails.

With respect to the Town, although a municipality may be liable for compensatory damages in § 1983 actions, it may not be subjected to punitive damages. *Newport v. Fact Concerts, Inc.* 453 U.S. 247, 271, (1981) ("consideration of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials"). Municipalities are also immune from punitive damages for state law claims "in the absence of statutory provision to the contrary." *Jackson v. Housing Authority of City of High Point,* 316 N.C. 259, 262-63 (1986). Notably, to abrogate the common law, a statutory provision must do more than merely provide for punitive damages; it must remove governmental immunity for those damages. *Id.,* 316 N.C. at 263. Plaintiff has not suggested that a statute has taken away the Town's immunity; therefore, the Town cannot be held liable for punitive damages.

### B. Motion in Limine and Motion to Strike

Through a Motion in Limine and Motion to Strike, Doc. No. 28, Plaintiff asks the Court to exclude from evidence certain exhibits and testimony offered by Defendants in support of their Motion for Summary Judgment: 1) the copy of the 911 recorded call, (Doc. No. 20-12); 2) the transcript of the 911 call, (Doc. No. 20-11); and 3) excerpts from the deposition of Taylor Dunn and Amy Craven discussing the 911 call , (Doc. No. 20-6 at 43:5-25, 51:1-25, 56:1-57:25 and Doc. No. 20-7 at 69:1-25) (collectively the "911 Call Evidence"). In support of these motions, Plaintiff

argues that "because [the Officers] did not hear any portion of the 911 call" prior to their encounter with Mr. Craven the 911 Call Evidence is "entirely irrelevant." The Court disagrees.

While the Court would, if requested, likely provide a cautionary and/or limiting instruction to the jury if this evidence was offered at trial,[17] portions of the 911 Call Evidence are plainly relevant to Plaintiff's claims, even though the Officers' did not hear the 911 call. The call shows Mr. Craven's knowledge that the police had been called and were coming, that he went out to meet them and that he expressed his belief that he would soon be dead at their hands. Also, the 911 call contains evidence that Mr. Craven was carrying a handgun and of his yelling, information that was conveyed to the Officers. All of this evidence is relevant to fully understanding the circumstances of the shooting and/or to corroborate the Officers' testimony, including that Mr. Craven reached for and pulled a gun. Further, the 911 call reflects the 911 operator's focus on the situation as a domestic violence incident, emphasizing the safety of Mr. Craven's wife and children, which in turn is reflected in what was told to the Officers as they approached the house. And conversely, the Court has considered that the 911 Call Evidence does not contradict the Officers' version of the incident.

Accordingly, the 911 Call Evidence, properly understood and considered as reflected above in connection with the Motion for Summary Judgment, is not "entirely irrelevant" to Plaintiff's claims, and Plaintiff's Motion in Limine and Motion to Strike will be denied.

### C.    Motions to Seal

---

[17] Of course, a cautionary and/or limiting instruction is not necessary for the Court's consideration of the Motion for Summary Judgment. The Court understands the appropriate purposes for which the 911 Call Evidence may be considered and is not unduly prejudiced by taking it into account.

In Consent Motions to Seal filed together with their memoranda related to the Motion for Summary Judgment, all Parties ask the Court to seal the most sensitive and graphic exhibits offered in support of their positions, including the Officers' body camera videos, the recording and transcript of the 911 call and the autopsy report. However, despite the Parties' understandable desire to protect the privacy of Plaintiff and her children and agreement on sealing this evidence, the Court must also consider the public interest in the transparency of judicial proceedings to determine if the evidence can be sealed. Weighing the competing needs for privacy and openness, the Court will in part grant and in part deny the motions, unsealing the evidence that the Court has relied on in making its decisions.

In general, the public has a right of access to judicial proceedings that stems from two sources: the common law and the First Amendment. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *see also Press–Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 508–09 (1984) (discussing the importance of an open trial as a means of both ensuring and giving the appearance of fairness in the judicial process). "[T]he common[-]law presumption in favor of access attaches to all 'judicial records and documents,'" *Stone v. University of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)), but "the First Amendment guarantee of access has been extended only to particular judicial records and documents." *Id.* (citing *Rushford*, 846 F.2d at 253). Under the more rigorous First Amendment standard, "denial of access must be necessitated by a compelling government interest and narrowly tailored to serve that interest." *Id.*; *see also Press–Enterprise Co.*, 464 U.S. at 509 ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored

34

to serve that interest."); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606–07 (1982) ("[I]t must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.").

The Fourth Circuit applies the heightened First Amendment right of access standard to exhibits submitted in support of summary judgment motions in civil cases. *See Rushford*, 846 F.2d at 252 (applying the First Amendment right of access standard to summary judgment filings and noting "summary judgment adjudicates substantive rights and serves as a substitute for a trial"); *see also, e.g., Jones v. Lowe's Companies, Inc.*, 402 F. Supp. 3d 266, 277–78 (W.D.N.C. 2019), aff'd, 845 F. App'x 205 (4th Cir. 2021); *Painter v. Doe*, No. 3:15-CV-369-MOC-DCK, 2016 WL 3766466, at \*3 (W.D.N.C. July 13, 2016) ("When a judicial document or record sought to be sealed is filed in connection with a dispositive motion, the public's right of access to the document in question arises under the First Amendment."). Accordingly, "a party moving to seal documents filed in support of a motion for summary judgment in a civil case bears a heavy burden." *Jennings v. Univ. of N. Carolina at Chapel Hill*, 340 F. Supp. 2d 679, 681 (M.D.N.C. 2004).

To limit access to documents submitted in connection with a summary judgment motion, the party seeking to seal the documents must make a showing "that the denial [of access] serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." *Rushford*, 846 F.2d at 253. However, courts have recognized that in certain circumstances, "private interests might also implicate higher values sufficient to override … the First Amendment presumption of public access." *Level 3 Commc'ns, LLC v. Limelight Networks, Inc.*, 611 F. Supp. 2d 572, 580 (E.D. Va. 2009); *see Borkowski v. Baltimore Cnty., Maryland*, 583 F. Supp. 3d 687, 694 (D. Md. 2021) (granting motion to seal sensitive medical information).

Furthermore, before sealing the documents, "the district court must follow the procedural requirements laid out in *In re Knight Publ'g Co*., 743 F.2d 231, 234 (4th Cir. 1984)." *Id*. These are: 1) the district court must give the public adequate notice that the sealing of documents may be ordered; 2) the district court must provide interested persons "an opportunity to object to the request before the court ma[kes] its decision"; 3) if the district court decides to close a hearing or seal documents, "it must state its reasons on the record, supported by specific findings"; and 4) the court must state its reasons for rejecting alternatives to closure. *See Rushford*, 846 F.2d at 253–54. "Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004). This approach also reflects the reality that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern," *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978), as well as that "the public's business is best done in public," *Cochran v. Volvo Grp. N. Am., LLC*, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013).

The Parties' sealing motions primarily rely on North Carolina statutes classifying the videos as non-public "law enforcement agency recordings," *see* N.C. Gen. Stat. § 132-1.4A, and making information, recordings, photographs and documents contained in a Medical Examiner's autopsy report not subject to disclosure to the general public. *See* N.C.G.S. § 130A-389.1. However, these state law confidentiality definitions are not dispositive. *See Pegram v. Williamson*, No. 1:18CV828, 2022 WL 541495, at *27 (M.D.N.C. Feb. 23, 2022). Regardless of the state statutes, the proponent of a request to seal must identify the applicable public access right, if any, and justify the request under that standard. *Id*., *see Sluder v. Bentancourt*, No. 1:20CV135, 2020

U.S. Dist. LEXIS 151529, at *1–3 (W.D.N.C. Aug. 20, 2020) (denying blanket motions to seal documents purportedly "confidential pursuant to state and federal law").

In exercising its discretion to seal an exhibit offered in support of a dispositive motion, the Court may consider "the strength of any property and privacy interests asserted," *see Leopold v. United States*, 964 F.3d 1121, 1128 (D.C. Cir. 2020) (citing *United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980)); however, there is no exception to the presumption of public access merely because evidence is sensitive, particularly where, as here, the exhibits sought to be sealed contain evidence that is highly probative to the case. *See Narciso v. Cnty. of San Diego*, No. 20CV116-LL-MSB, 2022 WL 3447509, at *11 (S.D. Cal. Aug. 17, 2022) (declining to seal body camera video footage). Moreover, the body camera videos and the transcript of the 911 call are of significance to the public, who have an interest in the transparency of law enforcement activity, particularly the use of force. Indeed, body cameras are worn in significant part to promote public awareness and police accountability. Therefore, the Court finds there is strong public interest in disclosure of the body camera video of Officer Arndt (except as described below) and the transcript of the 911 call which is not offset by a sufficient compelling private interest, and it will deny the Parties' request to seal that evidence.

However, Plaintiff has expressed legitimate concerns that disclosure of the exhibits beyond what is necessary to satisfy the public interest would invade her and her children's privacy, needlessly adding to their grief. The Court agrees with the Plaintiff and will accordingly grant the motions to seal the autopsy report (Doc. No. 20-10), the body camera video of Officer Novelli, (Doc. No. 26-3) (on which the Court did not rely because it is materially duplicative of Officer Arndt's video) and the recording of the 911 call (Doc. No. 20-12). Disclosure of that information

37

would violate Plaintiff and her children's privacy without furthering the public's ability to have access to the relevant facts and evaluate the Court's rulings. Also, with respect to Officer Arndt's body camera video, the Court will seal the portion from 7:01 to 16:23, which only shows the efforts of the police and medical responders to revive Mr. Craven, all of which is intensely private and immaterial to the Court's order.[18]

Finally, the Court has complied with the *In Re Knight* procedures described above. The public has been provided with adequate notice and an opportunity to object to the Motions to Seal, which were filed on January 20, 2023, and February 7, 2023, respectively, and they have been accessible through the Court's electronic case filing system since that time. *See* Doc. Nos. 17, 23. The Court has explained the reasoning for its ruling in this order. Also, having considered less drastic alternatives to sealing the exhibits to be sealed, the Court concludes that sealing these exhibits in the limited manner ordered is necessary to protect the Plaintiff's privacy interests.

Accordingly, the Court will grant in part and deny in part the Parties' Motions to Seal as described.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. No. 19) is **GRANTED**;

2. Judgment is entered in favor of Defendants on Plaintiff's claims;

3. Plaintiff's Motion in Limine and Motion to Strike (Doc. No. 28) is **DENIED**;

---

[18] The Town will be directed to provide the Court with a redacted copy of Officer's Arndt's body camera video showing only 0:00 to 7:00 and 16:24 to the end.

4. The Parties Motions to Seal (Doc. Nos. 17, 23) are **GRANTED** in part and **DENIED** in part as described above;

5. The Town of Mooresville is directed to provide the Clerk of Court with a redacted copy of Officer's Arndt's body camera video showing only 0:00 to 7:00 and 16:24 to the end within 14 days of the date of this order; and

6. Following the filing of the redacted exhibit as directed above, the Clerk is directed to close this matter in accordance with this Order.

   **SO ORDERED ADJUDGED AND DECREED**.

   Signed: March 12, 2023

   Kenneth D. Bell
   United States District Judge